UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

ANDRE MASSENA,

                              Plaintiff,

       v.                                                    3:10-cv-1245

LAURA BRONSTEIN; TARRICK ABDELAZIM;
BINGHAMTON UNIVERSITY STATE
UNIVERSITY OF NEW YORK; and
CITY OF BINGHAMTON,

                              Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

THOMAS J. McAVOY
Senior United States District Judge

## DECISION and ORDER

Plaintiff Andre Massena commenced the instant action against Defendants pursuant to 42 U.S.C. § 1983 arising out of his suspension from the Binghamton University Masters of Social Work program and the non-renewal of his contract with the City of Binghamton's VISTA Program. Presently before the Court are Defendants' Laura Bronstein and Tarrick Abdelazim's motions for summary judgment pursuant to Fed. R. Civ. P. 56 seeking dismissal of the Complaint in its entirety.

**I.    FACTS**

At all times relevant hereto, from August 2006 until November 2009, Plaintiff was a student at the State University of New York at Binghamton ("SUNY Binghamton"). Plaintiff was enrolled in the Social Work Department and pursuing Master's Degrees in Social Work ("MSW") and Public Administration ("MPA"). Defendant Laura Bronstein ("Bronstein") was

and is a professor at Binghamton University. She has served as Chair of the Social Work Department since 2006. From July 2008 through September 2008, Plaintiff was employed by the City of Binghamton as a VISTA Project Supervisor.[1]

Over the course of three meetings from March through June 2008, Plaintiff complained to Bronstein, Chair of the SUNY Binghamton Social Work Program, about the conduct of SUNY Binghamton Professor David Tanenhaus. Tanenhaus was, and continues to be, the Director of the Binghamton Housing Authority ("BHA"). Plaintiff complained that Tanenhaus was mistreating his tenants by, among other things, improperly evicting minorities. Bronstein did nothing in response to Plaintiff's complaints.[2]

On or about August 25, 2008, Plaintiff placed posters in a SUNY Binghamton building stating that "a particular tenant of color in one of Tanenhaus' buildings was wrongfully evicted." Compl. at ¶ 21 (hereinafter referred to as the "postering incident") . "The posters blamed the Binghamton Housing Authority and the Director of the Binghamton Housing Authority [Tanenhaus] . . . for the tenant's treatment, and they suggested that

---

[1] The Court takes judicial notice of the Volunteers in Service to America ("VISTA") program. See 42 U.S.C. § 4951, et seq. According to the statute:

> The purpose of [the program] is to strengthen and supplement efforts to eliminate and alleviate poverty and poverty-related problems . . . by encouraging and enabling persons . . . to perform meaningful and constructive volunteer service . . . where the application of human talent and dedication may assist in the solution of poverty and poverty-related problems and secure and increase opportunities for self-advancement by persons affected by such problems.

[2] Bronstein contends that any issues concerning the BHA were outside of her authority as Chair of the Social Work program at BU.

people call the SUNY Binghamton Social Work Department and the Binghamton Housing Authority to express their views." Id.[3]

On or about August 29, 2008, Bronstein sent Plaintiff an e-mail advising that Plaintiff had not met the requirements necessary to advance under the Social Work Department's Advancement Policy.  The purported bases for Bronstein's e-mail were that Plaintiff was alleged to have: (1) entered the University Downtown Center under false pretenses and continued to deny and lie about his activities in the building at that time; and (2) "perpetrated lies in this regard with University Police . . . and through emails with Professor Wiener and [Bronstein] where [Plaintiff] act[s] as if [he] had no knowledge of the posters distributed in the [University Downtown Center] that night; when in fact [he was] . . . observed on videotape distributing these posters [himself]."  Id. at ¶ 22.[4]

By letter dated September 2, 2008, Plaintiff was given a written plan that required, among other things, that he withdraw from his social work courses for the Fall 2008 semester, take a leave of absence during the Fall 2008 and Spring 2009 semesters, re-apply for admission into the program for the Spring 2009 semester, issue a formal statement retracting the statements in the posters, and discontinue the practice of urging community members to contact the Social Work Department to alleviate the wrongs alleged to have been committed by the BHA.  A disciplinary hearing was held on September 18, 2008. Bronstein ruled against Plaintiff.  Plaintiff appealed.

---

[3] A copy of the poster is attached as Exhibit 1.

[4] Plaintiff denies lying about his reason for being in the building and contends that the real reason for Brostein's letter was the content of his speech concerning Tanenhaus, the BHAuthority, and the SUNY Binghamton Social Work Department.

In or around September 2008, Defendant Tarrick Abdelazim ("Abdelazim"), the person responsible for administering the VISTA program, declined to renew Plaintiff's contract to be a VISTA Supervisor.

In an October 21, 2008 memorandum to the SUNY Binghamton College of Community and Public Affairs ("CCPA") Ethics and Integrity Committee, Bronstein recommended that Plaintiff be dismissed from the Social Work program.  Thereafter, in November 2008, the written plan and the allegations of misconduct against Plaintiff were withdrawn.  No action was taken against Plaintiff.

Based on the foregoing allegations, Plaintiff has asserted a claim that he was retaliated against for engaging in protected speech in violation of the rights guaranteed to him by the First Amendment.  Presently before the Court is Defendants Bronstein and Abdelazim's motions for summary judgment pursuant to Fed. R. Civ. P. 56 seeking dismissal of the claims against them in their entirety.

## II.     STANDARD OF REVIEW

Defendants move for summary judgment pursuant to Rule 56.  It is well settled that, on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the non-moving party, see Tenenbaum v. Williams, 193 F.3d 581, 593 (2d Cir. 1999), and may grant summary judgment only where "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  An issue is genuine if the relevant evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).  A party seeking summary judgment bears the burden of informing the court of the basis for the motion and of identifying those portions of the record that the moving party believes

demonstrate the absence of a genuine issue of material fact as to a dispositive issue. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the movant is able to establish a prima facie basis for summary judgment, the burden of production shifts to the party opposing summary judgment who must produce evidence establishing the existence of a factual dispute that a reasonable jury could resolve in his favor. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). A party opposing a properly supported motion for summary judgment may not rest upon "mere allegations or denials" asserted in his pleadings, Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 525-26 (2d Cir. 1994), or on conclusory allegations or unsubstantiated speculation. Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998).

With these standards in mind, the Court will address the pending motions.

### III.    DISCUSSION

Plaintiff brings claims of First Amendment retaliation. The elements of such a claim differ depending on the factual context. When the plaintiff is a public employee he must show: (1) constitutionally protected speech; (2) an adverse employment action; and (3) that the speech was a motivating factor in the adverse employment action. Ruotolo v. City of New York, 514 F.3d 184, 188 (2d Cir. 2008). These same elements apply to independent contractors with whom the government has an ongoing commercial relationship. See Board of County Com'rs, Wabaunsee County, Kan. v. Umbehr, 518 U.S. 668 (1996); Rockland Vending Corp. v. Creen, 2009 WL 2407658, at *13 (S.D.N.Y. 2009). Thus, with respect to Defendant Abdelazim, Plaintiff must show the above-listed elements.

On the other hand, in addition to showing an interest protected by the First Amendment, "private citizens claiming retaliation for their criticism of public officials have

been required to show that they suffered an 'actual chill' in their speech as a result." Zherka v. Amicone, 634 F.3d 642, 644-45 (2d Cir. 2011). Although there have been some instances where "other forms of harm have been accepted in place of this 'actual chilling' requirement," . . . as a general matter, First Amendment retaliation plaintiffs must typically allege 'actual chilling.'" Id. at 645. The requirement that a plaintiff show an actual chill "ensures an identified injury to one's right to free speech is established. Hurt feelings or a bruised ego are not by themselves the stuff of constitutional tort." Id. Thus, with respect to Defendant Bronstein, Plaintiff must demonstrate an actual chill. Garcia v. S.U.N.Y. Health Sciences Center of Brooklyn, 280 F.3d 98, 106 (2d Cir. 2001) (university students are not employed by the government).

### a. Whether Bronstein Took Action Against Plaintiff for the Content of His Speech

Bronstein first moves to dismiss on the ground that she did not act based on the content of Plaintiff's speech. Bronstein asserts that she was motivated not by Plaintiff's speech, but by pedagogical and ethical concerns based on facts suggesting that Plaintiff accessed the SUNY building where he hung the posters under false pretenses and gave false information to University Police in connection therewith. In support of this contention, Bronstein notes that she was aware of Plaintiff's opinions concerning Tanenhaus and the BHA long before the postering incident, she was aware that Plaintiff believed Tanenhaus to be acting unethically, she took a neutral position concerning the allegations about Tanenhaus, she never took action against Plaintiff (before the postering incident) for his complaints concerning Tanenhaus, she never told Plaintiff to discontinue his actions concerning Tanenhaus, she did not preclude Plaintiff from having opinions concerning

Tanenhaus, and she advised Plaintiff of the proper methods for voicing his concerns (e.g. complaining to the Housing Authority or the National Association of Social Workers).  In short, Bronstein argues that, because she was aware of the same general conduct by Plaintiff prior to the postering incident, but took no action against him, "Plaintiff's claims can survive only if he has proof that Dr. Bronstein's conduct was motivated by some nefarious 'intent' that arose between Mr. Massena's initial accusations against Tanenhaus in the Spring semester of 2008 and the time of the postering incident in the Fall semester of 2008."  Def. Mem. of Law at 4.  According to Bronstein, "[i]t is nonsensical to allege that Dr. Bronstein took no action when these claims were being made in the months prior to the postering incident, but somehow, as a result of the postering incident, Dr. Bronstein felt compelled to retaliate against him."  Id. at 7.  According to Bronstein, her concern was not with the content of the posters, but the manner and method in which they were placed.

  Plaintiff responds that there is evidence creating a triable issue of fact concerning whether Bronstein acted on account of the content of his speech.  This evidence includes: (i) that Bronstein was not aware whether Plaintiff was permitted to be in the building where he hung the posters; (ii) the September 2, 2008 written plan required Plaintiff to, among other things, issue a "formal apology . . . to all parties concerned," issue a "formal statement of retraction . . . indicating that he does not agree with, and regrets the sentiments expressed in the . . . statement, which he promoted, initially, by distributing posters/leaflets at the University Downtown Center that said: 'We will in no way, shape, or form apologize for any harm or inconvenience this poster may cause Binghamton Housing Authority or Binghamton University and their affiliates,'" and end the process of having persons contact the

Department of Social Work for perceived wrongs by the Binghamton Housing Authority; and (iii) the September 2, 2008 written plan was issued shortly after the postering incident.

Although there are many factors suggesting that Bronstein did not act on account of Plaintiff's speech, looking at the evidence in the light most favorable to Plaintiff, the Court finds that there is a triable issue of fact whether Bronstein acted on account of Plaintiff's speech. In particular, those portions of the September 2, 2008 written plan that required a formal apology, a statement of retraction, and an ending to people complaining to the Social Work Department could be found to have not related solely to the manner and method of Plaintiff's speech, but also to the content of his speech.[5]

### b. Whether There Was A Chilling Effect on Plaintiff's Speech

Bronstein next contends that her actions did not chill Plaintiff's speech. As noted, to succeed on his First Amendment claim, Plaintiff must demonstrate that Bronstein's action chilled his speech. This does not require proof that Plaintiff was silenced, but that Bronstein's actions had an actual, non-speculative deterrent effect. Colombo v. O'Connell, 310 F.3d 115, 117 (2d Cir. 2002). There must be an actual, potential chilling of Plaintiff's speech; not a chilling of the speech of a person of ordinary firmness. Zherka, 634 F.3d at 647 n.9. "Where a party can show no change in his behavior, he has . . . shown no chilling of his First Amendment right to free speech." Curley v. Village of Suffern, 268 F.3d 65, 73 (2d Cir. 2001).

---

[5] Although the plan was originally drafted by Plaintiff's advisor, Diane Weiner, it was reviewed by Bronstein prior to the meeting with Plaintiff and could be found by the trier of fact to have been adopted by Bronstein. See Def.'s Stmnt. of Mat. Facts at ¶ 77 ("Dr. Bronstein agreed to that draft. . . .").

- 8 -

Here, there is unrefuted evidence that, following Bronstein's actions, Plaintiff continued his speech unfettered. For example, Plaintiff wrote an undated letter to Bronstein (although clearly written after the incidents at issue here) addressing the situation and again discussing his concerns about Tanenhaus. Def.'s Ex. 14. In an e-mail dated October 6, 2008, Plaintiff sent a letter to various individuals at Binghamton University claiming that Tanenhaus engaged in unprofessional conduct and wrongfully evicted persons from Binghamton housing projects. In the e-mail, Plaintiff went on to discuss his feelings that he was being "kicked out" of the school of social work because of the exercise of his First Amendment rights and included an "eviction flyer" that he encouraged people to download. In a November 2008 e-mail, Plaintiff wrote to Bronstein discussing what he believed were improper evictions by the Binghamton Housing Authority. In the e-mail, Plaintiff stated that he "will make it a point to get the many students who were 'Advanced' out of the program for voicing their opinions or 'pissing' professors off to come forward." Plaintiff also demanded a response from Bronstein concerning the way she handled the matter and stated that "[if] I don't hear from you by Monday, I'll make that line famous in town and all over the Internet."[6] In another November 2008 e-mail, Plaintiff wrote "lets keep the fight going. . . . I don't want what happened to you and I to happen to another student again. This is why I won't stop fighting. I want the school to change and be better." Plaintiff also promoted lectures concerning "The State of Freedom on Campus" and discussing his experience with Binghamton University. See Def.'s Ex. 12. Plaintiff also encouraged the NAACP and other organizations to assist him in his cause. Id. at Ex. 27; Massena Dep. at p. 121. When asked

---

[6] Plaintiff was referring to the e-mail Bronstein sent to him advising that the University was not pursuing the charges against him. In the one line e-mail, Bronstein stated "[d]ue to procedural misunderstandings, the case pertaining to you is no longer being pursued."

at deposition the names of the organizations that he contacted, Plaintiff responded, "[t]here were so many, I couldn't recall any specific names." Id. at 122.  Plaintiff did recall contacting FIRE, an entity that wrote several articles about Plaintiff's situation.  Id.  In his communications with these organizations, Plaintiff "showed them the posters."  Id. at 122. At deposition, Plaintiff admitted that he contacted the television, radio and Internet sources within two or three days of his meeting with Bronstein.  Id. at 121-22.  Significantly, in its Statement of Material Facts submitted pursuant to N.D.N.Y.L.R. 7.1(a)(3), and citing the evidence discussed above, Defendant contended that "after the postering incident, Mr. Massena was never dettered or otherwise 'chilled' from exercising his First Amendment free speech rights."  Def.'s Rule 7.1(a)(3) Statement at ¶ 99.  In his responsive statement of material facts, Plaintiff admitted this assertion.  See also Def. Abdelazim Rule 7.1.(a)(3) Statement at ¶¶ 74, 77, 78, 79.  "Because [Plaintiff admitted] . . . that [his] speech was not restricted in fact by [Bronstein's actions] . . . and alleged no actual affect on the exercise of [his] First Amendment rights at all, [Plaintiff's] claim fails." Colombo, 310 F.3d at 117; see also Zherka, 634 F.3d 642, 645 (2d Cir. 2011) (noting that it would be difficult for the plaintiff to establish a chilling effect where he continued to publish critical articles); Williams v. Town of Greenburgh, 535 F.3d 71, 78 (2d Cir. 2008); Curley, 268 F.3d at 73 (a plaintiff is unable to demonstrate an actual chill where there is no change in his behavior); Singer v. Fulton County Sheriff, 63 F.3d 110, 120 (2d Cir. 1995); Spear v. Town of West Hartford, 954 F.2d 63, 67.  For these reasons, the claims against Bronstein are DISMISSED.

        **c.**    **Whether Plaintiff Engaged in Protected Speech**

Defendant Abdelazim moves for summary judgment on the ground that Plaintiff's speech was false, that it was made with knowledge of its falsity or a reckless disregard of the truth and, therefore, is not protected speech. "False speech, as well as hyperbole, is still entitled to First Amendment protection, as long as it is not made with knowledge or reckless disregard of its falsity." Reuland v. Hynes, 460 F.3d 409, 414 (2d Cir. 2006); see also Pickering, 391 U.S. ___, 574 ("[A]bsent proof of false statements knowingly or recklessly made by him, a [public employee]'s exercise of his right to speak on issues of public importance may not furnish the basis for his dismissal. . . ."); Westmoreland v. Sutherland, 662 F.3d 714 (6th Cir. 2011); Anderson v. Cahill, 417 Fed. Appx. 92, 94 (2d Cir. 2011). To establish that Plaintiff's speech is not entitled to protection, Defendant must show that the statement: (1) would reasonably have been perceived as an assertion of fact; (2) was false; and (3) was made with knowledge or reckless disregard of its falsity.

Here, considering the nature of the language used (i.e., whether it has a precise meaning that is readily understood and whether it is capable of being objectively characterized as true or false), the circumstances under which the poster was placed, and the full context of the poster, the Court finds that the reasonable reader would perceive that it was making an assertion of fact that the BHA acted inhumanely by fabricating reasons to evict a young, single mother with several small children (Ebboni Gaspard) because she fought for change, advocated for residents, challenged the establishment, and testified in court on "behalf of those discriminated against facing injustice" and that other persons who stand up for social justice and advocate for those who do not have a voice endure "consequences" (such as eviction) from the BHA. See Kirch v. Liberty Media Corp., 449 F.3d

388, 402-03 (2d Cir. 2006) (discussing factors to consider in determining whether a communication is opinion or fact.).[7]  This establishes the first requirement set forth above.

The next issue is whether this statement was false.  In response to paragraph 39 of Defendant Abdelazim's Statement of Material Facts, Plaintiff admitted that Ebboni Gaspard (the individual referenced in the poster) was not wrongfully evicted and that she was given all required due process before being evicted.[8]  The undisputed facts demonstrate that Ms. Gaspard was evicted for failing to perform the required community service and submitting fraudulent paperwork in support of her claim that she did complete the required community service.  Thus, there is no support for the poster's contention that the BHA fabricated

---

[7] These factors, which are ordinarily used in defamation cases under New York law, include:

(1) an assessment of whether the specific language in issue has a precise meaning which is readily understood or whether it is indefinite and ambiguous; (2) a determination of whether the statement is capable of being objectively characterized as true or false; (3) an examination of the full context of the communication in which the statement appears; and (4) a consideration of the broader social context or setting surrounding the communication including the existence of any applicable customs or conventions which might signal to readers or listeners that what is being read or heard is likely to be opinion, not fact.

[8] Plaintiff further admitted the following facts:

a. On May 28, 2008, she was provided a grievance hearing concerning an alleged failure to perform required community service and submitting fraudulent paperwork.  The hearing officer found that a letter submitted as proof of community service was fraudulent.

b. After the HUD grievance an eviction proceeding was commenced in Binghamton City Court and a warrant of eviction was issued.

c. Ms. Gaspard appealed the original City Court decision to Broome County Court and received a stay of execution of the warrant of eviction until, August 15, 2008, and on August 8, 2008, she filed a motion to reargue in County Court and requested an additional stay pending re-argument.  That motion was denied on August 13, 2008, and the stay lapsed on August 15, 2008.

d. While the Broome County Court stayed the execution of the warrant, Ms. Gaspard also submitted a motion to reargue in City Court.  On August 15, 2008, the Binghamton City Court issued a Decision & Order on Ms. Gaspard's motion to reargue.   The City Court concluded its decision by stating, "It is the Court's opinion that the Respondent Gaspard committed perjury on the stand and submitted a false and forged document to support her perjury."

reasons to force Ms. Gaspard out of her home or that the eviction was in retaliation for Ms. Gaspard's having "challenged the establishment" and testified in court on behalf of others who were allegedly discriminated against.  Accordingly, the poster is false.

The final question is whether the statements were made with knowledge of their falsity of a reckless disregard for the truth.  The Court finds that this element also has been established.  Plaintiff assisted his supervisor, Mr. Gluck, in advocating on behalf of Ms. Gaspard.  He, thus, was generally familiar with her circumstances.  At deposition, Plaintiff admitted that he learned the result of the HUD hearing,[9] Pl. Dep. at 133-34, he knew that there was a finding that she provided forged documents, id. at 134, and he knew that the last decision concerning the final award for eviction was made prior to placing the posters.  Id. at 134-35.  These undisputed facts demonstrate that Plaintiff acted with knowledge of falsity or, at the very least, a reckless disregard for the truth.  Accordingly, his statements are not entitled to First Amendment protection and his claims must be dismissed.[10] [11] [12]

---

[9] At the HUD hearing, the hearing officer found that Ms. Gaspard did not submit valid proof that she completed her community service and that the proof she submitted was not an official document. The hearing officer, therefore, ruled that the eviction proceedings should continue.

[10] Plaintiff argues that any claimed assertions of fact were not statements made by him, but a quotation attributed to Ms. Gaspard.  This is irrelevant because Plaintiff admits he authored the poster. In any event, republishing another person's false statement does not thereby render the statement true or otherwise change the character of the statements such that they become entitled to First Amendment protection.

[11] Although Defendant Bronstein did not make this argument, this analysis equally applies to the claims against her.

[12] At the very least, a reasonable person could have believed that Plaintiff knowingly or recklessly made false statements and, therefore, Abdelzaim is entitled to qualified immunity.  See Kiessel v. Oltersdorf, 2012 WL 265953, at *4 (6th Cir. 2012); Westmoreland, 662 F.3d 714; See v. City of Elyria, 502 F.3d 484, 495 (6th Cir. 2007) ("an official who reasonably believes that an employee deliberately or recklessly made false statements could also reasonably conclude that such employee could be disciplined without violating the First Amendment.").

## IV.     CONCLUSION

For the foregoing reasons, the pending motions for summary judgment are GRANTED and the Complaint is DISMISSED IN ITS ENTIRETY.

IT IS SO ORDERED.

Dated: April 18, 2012

_____
Thomas J. McAvoy
Senior, U.S. District Judge

**EXHIBIT 1**

## HUMAN RIGHTS VIOLATION OR PURE CRUELTY?

After 8 years of residency at Saratoga Heights and serving as Tenant Relations President for two years, this single young woman was evicted with 3 young children (all under 15 years of age), with her new born baby, barely 2 weeks old, into the streets this month. **SHE IS NOW HOMELESS**. She is living in her car.

*IS THERE A WRONG A MOTHER CAN DO TO WARRANT THIS TYPE OF SUFFERING ON HER CHILDREN IN OUR SOCIETY?*



*This is not about me anymore but about the consequences citizens in our community have to endure for standing up for social justice, advocating for those who do not have a voice. As president of BHA for 2 years, I fought for change and advocated for residents in our community. As a result of challenging the establishment and testifying in court on behalf of those discriminated against facing injustice, reasons had to be fabricated to forced us out of our home. The community doesn't have an answer for us. And I do not have any answers for my children. Hopefully I can move from my car to a happy home with my love ones before winter. This is one of the many faces of injustice…and it does( not) discriminate. I'm Ebboni Gaspard, and I approve this message*

This is the treatment many victims of BHA have faced and will continue to face. **Binghamton Housing Authority** is the RESPONSIBLE party for this form of INHUMANE practice. Binghamton Housing's Director holds a MASTERs degree in social work and is currently teaching social work at **BINGHAMTON UNIVERSITY**. Please **CALL** Binghamton Housing Authority and the Social Work Department at the university to let them know what you think.

BHA: 607-723-9491
Binghamton University Social Work department: 607-777-5999

At JUSTICESPEAKS we are committed to promoting social justice and fairness, but more importantly, to serve as a voice, be an ally for the "undesirables" in our community. Our goal is to further the fight in dismantling the forces hindering the success of those less fortunate in our community. At JUSTICESPEAKS, we welcome the poor; those discriminated against, disabled, and simply those unafraid to take a punch to keep the wheel of justice turning. We will in no way, shape, or form apologize for any harm or inconvenience this poster may cause Binghamton Housing Authority or Binghamton University and their affiliates. This document may be reprinted and distributed unrestricted for the sole purposes stated above. Want to join us or support the cause for social justice? Please feel free to contact us at justicespeaks2008@yahoo.com for updates and details on how to support the movement for justice for all in our community.